# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3572 | **DATE** | 5/27/2004 |
| **CASE TITLE** | Tempco Electric Heater Corporation vs. Temperature Engineering Company | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Prime's Motion for Partial Summary Judgment is DENIED as to Counts I, II, and III, and GRANTED as to Counts IV, V, and VI.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| ✓ | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | JUN 0 3 2004 |
| | Notified counsel by telephone. | date docketed |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | GMA docketing deputy initials |
| | Copy to judge/magistrate judge. | date mailed notice |
| WAP | courtroom deputy's initials | Date/time received in central Clerk's Office — mailing deputy initials |

**Document Number**

**FILED**

MAY 2 7 2004

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

TEMPCO ELECTRIC HEATER
CORPORATION,

          Plaintiff,

    v.

TEMPERATURE ENGINEERING
COMPANY, d/b/a PRIME
INDUSTRIES,

          Defendant.

Case NO. 02 C 3572

Hon. Harry D. Leinenweber

**DOCKETED**

JUN 0 3 2004

### MEMORANDUM OPINION AND ORDER

Plaintiff Tempco Electric Heater Corporation ("Tempco") brought suit against one of its former distributors, Temperature Engineering Company, d/b/a Prime Industries ("Prime"), alleging trademark infringement, various breaches of contract, and misappropriation of trade secrets. Prime has now moved for Partial Summary Judgment.

### I. FACTUAL BACKGROUND

Tempco manufactures electric heaters and temperature sensors used largely as component parts on manufacturing equipment in the plastics industry. Prime distributes such products throughout the southeastern United States. In 1996, Tempco and Prime signed a "Distributor Agreement," that allowed Prime to become an authorized distributor of Tempco-products.

For purposes of this litigation, three clauses of this agreement are relevant: Sections I, IX(D), and XII(B). Section I is entitled "Geographical." Section 1(A) is the only subsection of § 1, and

*lolo*

reads in its entirety "State *[sic]* of Georgia, Alabama, Tennessee, and Mississippi." Section IX(D) is a restrictive covenant that states "Distributor shall be allowed to carry other lines in related fields, none to be competitive with Tempco products, as illustrated in Tempco's Product Line Catalog." Lastly, Section XII(B) is an integration clause reading "This agreement embodies the entire agreement and understanding between Prime Industries and Tempco Electric Heater Corporation and supersedes all prior agreements and understandings related to the subject matter."

Hand-in-hand with the Distributor Agreement came a License Software Agreement that permitted Prime, as an authorized Tempco distributor, to use Tempco's trade secret electric pricing program known as SA/2. This agreement mandated that Prime use SA/2 "exclusively for purposes consistent with your relationship with TEMPCO." The agreement also provided Prime with Tempco-supplied "hardware access keys" that allowed SA/2 to work. The License Software Agreement further stipulated that Prime must pay Tempco $15,000 plus interest in "liquidated damages" per key that it fails to return to Tempco at the conclusion of their relationship.

Tempco claims that shortly after signing the Distributor Agreement, Prime began violating it by selling competitors' products. To this end, Tempco alleges that Prime misused SA/2 by using it to allow Tempco's competitors to underprice Tempco. In Tempco's version of the facts, Prime's misuse of SA/2 began during the distributorship and continued after the distributorship ended. According to Tempco,

Prime accomplished this latter unauthorized use of SA/2 by improperly retaining three hardware access keys in violation of the License Software Agreement.

Tempco further claims that Prime removed Tempco's name and identifying information from Tempco products sold to Prime's customers. As alleged by Tempco, this "reverse passing-off," as the process is known in legalese, allowed Prime to claim falsely that it manufactured the products it sold – depriving Tempco of the name-recognition necessary to obtain repeat business.

## II.  DISCUSSION

### A. Counts I & II: Violations of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); Breach of Trademark License Agreement

Tempco's Count I states a claim for "reverse passing off" under a false designation of origin theory under the Lanham Act.  On the same set of allegations, Tempco also presents Count II, under a theory of breach of the trademark license agreement.  Prime seeks summary judgment on Counts I and II arguing that Tempco has submitted no evidence to support its claims.  In particular, Prime claims that Tempco has no evidence that it ever engaged in "reverse passing off" of Tempco-manufactured products. Rather Prime says that the only "reverse passing off" that did occur happened when Tempco itself agreed to label privately some of its products for Prime.  Prime also argues that even if the Court finds such false designation of origin, Tempco has submitted no evidence that Prime's conduct generated the "likelihood of confusion" necessary to invoke the Lanham Act's

jurisdiction. Prime argues that this is not surprising, as it claims that it has always presented itself as strictly a distributor, and not a manufacturer.

Reverse passing off, as its name implies, occurs when "a producer misrepresents someone else's goods or services as his." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 (2003). It is a cognizable legal theory allowing one to recover under the Lanham Act. *See Id.* at 30. However, even if a plaintiff establishes that "reverse passing off" occurred in fact, the plaintiff must still show that defendant's actions caused a "likelihood of confusion." However, if a defendant "willfully appropriates the mark of another, a court is more inclined to find likelihood of confusion." *Rust Env't & Infrastructure v. Teunissen*, 131 F.3d 1210, 1219 (7th Cir. 1997). Nevertheless, a judicial finding of likelihood of confusion depends on the outcome of a seven-factor balancing test analyzing: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant." *Id.* at 1217.

Here, Tempco attempts to overcome Prime's motion with a substantial war-chest of testimonial and other evidence. Central to Tempco's case is the testimony of former or current Prime employees Richard Hudson ("Hudson"), Romesa Sears ("Sears"), and Tara Perrin ("Perrin"), along with the testimony of Tempco's new distributor in

- 4 -

the southeastern United States, David Farmery ("Farmery"). Hudson, in deposition testimony, states that former Prime employees repeatedly told him about how Kendrick ordered them to grind off Tempco's name and/or part number from Tempco products. Hudson, along with Farmery, also testified that, during visits to Prime's customers, they recalled seeing what appeared to be Tempco-manufactured heaters with Prime's name and part number on them, and "grinder marks" in the places where Tempco's normally located its identifying marks. Similarly, Sears testified that, during her Prime employment, she threw away Tempco's labels on Tempco-produced thermocouples, and replaced them with a Prime label. Lastly, Perrin reported that she would hang tags with Prime's name and part number onto Tempco's products - tags which Hudson and Farmery recalled seeing on Tempco products sold by Prime.

Supplementing this wealth of testimonial evidence, Tempco presents some other evidence of a more circumstantial nature. For example, Tempco notes that Prime possesses a bench grinder and a sanding belt, which it could use to effectuate the "reverse passing off." In addition, Tempco points out that Prime admits to private labeling seventy-five heaters it purchased from Akinsun Heaters, albeit apparently with consent. Furthermore Tempco notes that Kendrick admitted that Prime desired putting its name on products it sold but did not manufacture, for the "same reason Sears puts their name on Kenmore washing machines; we'd like to have the repeat business."

Prime attempts to respond to this evidence, but for the most part its arguments are unpersuasive. Prime correctly reiterates that Tempco itself agreed to privately label *some* of its heaters as "Prime Industries" heaters. However, the undisputed record shows that Tempco agreed only with respect to ten heaters - a quantity inadequate to account totally for Tempco's allegations. Similarly, Prime correctly notes that its private labeling of Akinsun Heaters has no relevance to the present case. However, Prime fails to rebut adequately the testimony of Hudson and others that Prime purposefully and willfully misbranded Tempco's products as their own. Therefore, for purposes of summary judgment, Tempco has certainly met its factual burden that reverse passing off did, in fact, take place.

The inquiry now turns to whether or not Tempco can establish that this reverse passing off created a "likelihood of confusion" under the seven-factor test. To support its claim, Tempco argues that Prime's willful misbranding entitles it to a presumption of confusion. However, the cases Tempco cites say no such thing. Rather, they merely state that willful infringement might make courts "more inclined" to find a likelihood of confusion, or create a "powerful inference" of confusion." *Rust*, 131 F.3d at 1219; *Resource Developers v. Statute of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 140 (2nd Cir. 1991). Therefore, while the Court agrees that Prime's alleged willful infringement makes it easier to find a likelihood of confusion - indeed "intent" serves as the seventh part

of the seven-part test - it certainly does not grant Tempco a "presumption" of confusion.

Tempco also tries to establish a likelihood of confusion through hearsay testimony that Prime's alleged acts of false designation of origin succeeded in sowing confusion amongst its customers. For example, Tempco presents as evidence, testimony from Hudson that customers, such as Daniel Dean of Amoco Fabrics and Fibers, expressed confusion about whether Prime manufactured its heaters itself. Similarly, Tempco attempts to submit a statement by Prime customer William Smith to Farmery conveying Smith's impression that "Prime Industries, I figured they were the manufacturer."

Prime challenges that this "evidence" qualifies only as inadmissable hearsay, and asks the Court to exclude it for purposes of summary judgment just as it would for trial. Tempco attempts to cure the hearsay problems by claiming that the hearsay statements of Smith, Dean, and unnamed other customers qualify as admissible "present sense impressions" under Federal Rule of Evidence 803(1). This rule exempts from hearsay "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter." *Id*. To qualify as an admissible present sense impression, three requirements must be met: "(1) the declarant must have personally perceived the event described; (2) the declaration must be an explanation or description of the event rather than a narration; and (3) the declaration and the event described must be contemporaneous." *United*

*States v. Santos*, 65 F. Supp. 2d 802, 822 (N.D. Ill. 1999). "The underlying rationale of the present sense impression exception is that substantial contemporaneity of event and statement minimizes unreliability due to defective recollection or conscious fabrication. There is no per se rule indicating what time interval is too long under Rule 803(1). . . ." *United States v. Parker, 936 F.2d 950, 954* (7th Cir. 1991). Lastly, the availability of the declarant is "immaterial." Fed. R. Evid. 803.

After reviewing the circumstances of the alleged hearsay, the Court agrees with Prime that Dean's statements to Hudson do not fall under the present sense impressions exception to the hearsay rule. According to Hudson's deposition testimony, the context of Dean's statement occurred "in Nashville it was - Daniel Dean made a comment when I was in the storeroom one time about, you know, what - what- am I getting, you know what - what is this, because it had the Prime name and number on it." Hudson Dep., pp. 143-144. In doing so, the statement appears to lack an essential component of admissible testimony under the 803(1) exception: it fails to describe an "event or condition." Indeed, while it was made, no "event" was happening to or around Dean. Rather, the statement appears to be a reflection of Dean's perhaps long-held uncertainty as to whether or not Prime functioned as a manufacturer. Therefore, the Court excludes this statement.

Similarly, the Court also excludes Smith's statements to Farmery. These statements occurred in the context of Farmery and

Smith reviewing stock reports that included Tempco products bought from Prime. Farmery claims that during the review, Smith casually remarked how "at some point we thought Prime was a manufacturer for these items." Smith also recalled about how "when he got products in, got paperwork in, it would say Prime Industries. . . . I figured they were the manufacturer." The first portion of Smith's declaration does not qualify as a present sense impression because it also fails to describe a present-time event (unlike Dean's testimony, an "event" did take place - the stock review, however, Smith's statement does not relate to any description or explanation of this review). The latter portion of Smith's declaration would have qualified as a present sense impression - if actually said *while or immediately after* - Smith's receipt of the products. As is, however, this declaration amounts to nothing more than a *memory* of a past sense impression Smith felt or said at some time previous. Although a present sense impression need not be contemporaneous with an event, this Court cannot agree that statements said months or years after the event qualify as "present sense impressions."

The remainder of Hudson's hearsay testimony may or may not be admissible. Its admissibility depends upon the specific circumstances in which the apparently unnamed Prime customers and potential customers expressed their confusion.

Prime responds with unrefuted evidence that it believes counters Tempco's claims regarding a likelihood of confusion. Prime notes that its marketing materials state that Prime "represent[s] some of

the largest heater and sensor manufacturers in the nation." These materials further describe Prime as "the largest stocking distributor" for different types of heaters, and as "one of Tempco's largest distributors." In Prime's view, these materials clearly show that Prime never represented itself as a manufacturer, and therefore could not possibly confuse anyone. Prime continues that any customer confusion was particularly unlikely because its customers were sophisticated and understood precisely what they were purchasing.

With most, indeed possibly *all*, of Tempco's evidence of actual confusion excluded, Tempco has only its evidence of "reverse passing off" and defendant's intent" to support its claims under the seven-factor test. Nevertheless, the Court believes this evidence sufficient to withstand summary judgment. Looking at the seven-factor test, the first and fifth factors - the "similarity between the marks" and the "strength of complainant's mark" bear no relevance in a "reverse passing off" action. Of the remaining factors, factors two and three - the "similarity of the products" and the "area and manner of concurrent use" heavily favor Tempco - as the products and their use were the same regardless of whose mark they bore. Correspondingly, factor seven, the "intent of defendant" also favors Tempco, as it sufficiently alleges willful infringement. This leaves only factors four and six - "degree of care" exercised by consumers and evidence "actual confusion" as possibly favoring Prime. This Court has no desire to assume improperly the role of a fact finder in weighing the respective strengths and weaknesses of both parties'

cases under the balancing test. Suffice it to say, the Court believes that a reasonable jury could find for either side under this balancing test - rendering this issue inappropriate for summary judgment. This is consistent with the Seventh Circuit's guidance that Courts should decide likelihood of confusion issues on summary judgment only if "the evidence is so one-sided that there can be no doubt about how the question should be answered." *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996).

Consequently, the Court denies summary judgment on Count I. As Count II is based on the same factual allegations, and also states a sufficient legal claim, the Court similarly denies summary judgment on Count II.

### B. Count III: Legality of the $15,000 Lost Key Fee

With respect to Count III, Prime seeks only a limited summary judgment on the issue of the License Software Agreement's $15,000 "liquidation damages" provision for each hardware access key that Prime failed to return to Tempco. Prime argues that the $15,000 fee actually constitutes an unenforceable penalty under Illinois law. Tempco responds by arguing that the fee is enforceable, and that Prime waived its right to challenge the fee by failing to raise this argument as an affirmative defense in its answer to Tempco's amended complaint.

In Illinois, "whether a contractual provision for damages is a valid liquidated-damages provision or a penalty clause is a question of law. There is no fixed rule applicable to all liquidated-damages

- 11 -

agreements, and each one must be evaluated on its own facts and circumstances." *Penske Truck Leasing Co., L.P. v. Chemetco*, Inc., 311 Ill. App. 3d 447, 454 (Ill. App. Ct. 2000) (internal citations omitted). Generally, Illinois courts uphold liquidated damage provisions only when: "(1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained; and (3) actual damages would be uncertain in amount and difficult to prove." *MED+PLUS Neck & Back Pain Ctr. v. Noffsinger*, 311 Ill. App. 3d 853, 860 (Ill. App. Ct. 2000)(internal citation omitted). Additionally, "the damages must be for a specific amount for a specific breach; they may not be a penalty to punish nonperformance or as a threat used to secure performance." *Id* (internal citation omitted). When faced with a close call, Illinois courts "lean toward a construction which excludes the idea of liquidated damages and permits the parties to recover only damages actually sustained." *Penske*, 311 Ill. App. 3d at 457. Nevertheless, the party seeking to exempt itself from a liquidated damages provision to which it has freely consented "has the burden of proof" to show that the clause is in reality an unenforceable penalty. *First Nat'l Bank v. Atlantic Tele-Network Co.*, 946 F.2d 516, 522 (7th Cir. 1991).

Here, Prime attempts to establish that the provision constitutes an unenforceable penalty by noting that both parties agree that the

keys have no intrinsic value. Rather, their value comes solely from their ability to enable someone to access SA/2. Prime further argues that the penalty nature of the liquidated damage clause is shown by the fact that it charges an additional $15,000 fee for *each key* not returned – when only one key is needed to access SA/2. Because of this, Prime claims that Tempco Vice-President of Sales Joseph Podge ("Podge") himself admitted in deposition that the liquidated damages provision is a "penalty."

Tempco responds by noting, correctly, that Prime's citation to Podge's deposition testimony is out-of-context, and in no way constitutes an admission that the liquidated damages provision is unenforceable. Tempco then persuasively argues that the liquidated damages provision serves as a valid check to ensure that a licensee of SA/2 ceases to use SA/2 if Tempco revokes their license. Without such a check, Tempco notes that these ex-licensees would have no incentive to return all their keys, permitting them to continue covertly to use the SA/2 illegally. Consequently, Tempco argues – and this Court agrees – that the liquidated damages provision serves the legitimate purpose of compensating Tempco for the *possible* but uncertain misuse of its intellectual property. This Court further concurs with Tempco that the clause's charge of $15,000 per key serves this legitimate purpose – as the more keys that go unreturned, the greater the potential for misuse of SA/2, including simultaneous misuse by different parties in different locations.

Because this Court agrees with Tempco that the liquidated damages provision is valid, it does not reach the issue of whether or not Prime waived its right to contest such use.

### C. Counts IV & V: Misappropriation of Trade Secrets, Conversion

Count IV alleges that Prime misappropriated Tempco's trade secrets by inappropriately using SA/2 to benefit Tempco's competitors. Count V seeks relief for the same factual allegations under a common-law theory of conversion. Similar to its motion with respect to Counts I and II, Prime seeks summary judgment concerning Counts IV and IV on the grounds that Tempco has not presented any evidence that Prime ever misused the SA/2 pricing program. Tempco responds to Prime's motion by claiming there exists both direct evidence and a "web of circumstantial facts that lead to the inference" that Prime misused SA/2. As to direct evidence, Tempco notes that former Prime employee Richard Hudson testified in deposition that he used SA/2 as a "standard" that allowed Prime to "shop around" for the best price among Tempco *and* its competitiors. Similarly, Tempco's list of "circumstantial facts" includes, among other things: Prime's sales of the products of Tempco's competitors; Prime President Larry Kendrick's request to new Prime employees Steven Shoemaker and Chuck Hixson that they not return hardware access keys acquired while working at PE Products; Prime's website claim that it has "developed a Manufacturer's OEM cross reference," one of SA/2's functions; Hudson's testimony that Kendrick told one of

Prime's salespersons that he had found a way to access SA/2 databases using a commercially available software program called Crystal Reports; Prime's failure to remove SA/2 from Shoemaker's laptop at the end of its distributorship; and Prime's failure to return three hardware access keys at the end of its distributorship.

Judging from this list, and Tempco's response brief, Tempco appears to make the argument that Prime not only misused SA/2 after the end of its License Software Agreement with Tempco, by illegally retaining and using it without permission, but also *during* its distributorship as a tool to benefit Tempco's competitors. This theory does not appear anywhere in Count IV of Tempco's Complaint or Amended Complaint. Instead, Count IV of Tempco's Amended Complaint states a clear and limited theory of trade secrets misappropriation: that Prime "used the software [SA/2] and the information contained therein for its own commercial advantage after the termination of the System/Software Agreement on March 18, 2002)." Therefore, it appears that Tempco is attempting constructively to amend its complaint at the summary judgment stage. Parties may constructively amend their complaint during the early stages of litigation, such as by interrogatory answers, or by waiver of the opposing party. *See Hytel Group, Inc. v. W.L. Gore and Assocs.*, 2004 U.S. Dist. LEXIS 2472 at *2-3 (N.D. Ill. 2004). However, "a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996).

- 15 -

In its late-filed surreply, Tempco argues that its claim is neither "new or novel" because "the license created a confidential relationship between Prime and Tempco, and imposed a duty upon Prime to maintain the secrecy of SA/2 software and limit its use by competitors of Tempco and all others who lack a bonafide interest in purchasing Tempco products." While possibly true, the Court fails to see how the simple terms of the License Software Agreement between Tempco and Prime creates a *de facto* claim that Prime misappropriated trade secrets *prior* to the termination of the license agreement by using SA/2 to benefit Tempco competitors.

Second, Tempco argues that under Federal notice pleading requirements, it did not need to specify that its trade secrets misappropriation claim derives both from Prime conduct during and after the termination of the License Software Agreement. In effect, Tempco argues that the complaint's allegation of trade secrets misappropriation under one theory and set of allegations (*i.e.*, Prime's purported retention and use of SA/2 post-termination of the license) provided Prime with proper notice of an unmentioned separate theory of trade secrets misappropriation based on different and undisclosed factual allegations. This argument is not convincing. True, the Federal Rules of Civil Procedure do not require complaints to "articulate legal theories." *Pond v. Michelin North America, Inc.*, 183 F.3d 592, 597 (7th Cir. 1999). However, "[a] complaint must narrate a claim, which means a grievance such as 'the City violated my rights by preventing me from renovating my apartments.'" *Albiero*

*v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997). Here, Tempco narrated its claim, effectively "Prime misappropriated SA/2 by retaining it unlawfully after termination of the license agreement." Although "a plaintiff may substitute one legal theory for another without altering the complaint," the complaint must still "specif[y] the wrong done to him." *Id.* In this case, Tempco specified the wrong done to it – Prime's retention and use of SA/2 after termination of its License Software Agreement. As the Seventh Circuit notes, "[t]here must be a point at which a plaintiff makes a commitment to the theory of its case." *Johnson v. Methodist Medical Ctr.*, 10 F.3d 1300, 1304 (7th Cir. 1993). In the present case, Tempco elected to proceed throughout the entire litigation under a narrow, overly specific theory of trade secrets misappropriation. At this late stage, it violates principles of justice to permit Tempco to succeed in effectively "hiding" this claim until shortly before trial. Consequently, the Court grants summary judgment as to any or all claims regarding Count IV's allegations that Prime misappropriation trade secrets prior to the termination of the License Software Agreement on March 18, 2002.

That being said, the Court notes that Count III of Tempco's complaint concerns Prime's alleged "Breach of the Software/System Agreement." Unlike Count IV, Tempco chose broadly and unspecifically to plead Count III stating only that "Prime has materially breached the Software/System Agreement as alleged herein." Under this agreement, Prime contracted to "use [Prime's] best efforts to protect

- 17 -

such information from unauthorized discovery or use." License Software Agreement, § 10. Certainly, a legitimate question of material fact at least exists as to whether or not the use of SA/2 to sell competitor's products violates this "best efforts" clause, and perhaps other clauses of the License Software Agreement. Furthermore, one can certainly read the broadly plead Count III alleging only unspecified "material breaches" as including such allegations. Therefore, although the Court grants summary judgment on Count IV with respect to Tempco's theory that Prime used SA/2 during the term of the License Software Agreement to benefit competitors, the Court in no way wishes the parties to misinterpret its ruling as suggesting that Tempco cannot present this claim at trial as part of its effort to prove Count III.

As to the remaining claims for misappropriation of trade secrets, Tempco does present a fair amount of circumstantial (but no direct) evidence. Because direct evidence of misappropriation of trade secrets is typically not available, under Illinois law a plaintiff can rely on circumstantial evidence to prove misappropriation. *RKI, Inc. v. Grimes*, 200 F. Supp. 2d 916, 923 (N.D. Ill. 2002). Beyond mere admissibility, Illinois law appears remarkably unclear as to what level of circumstantial evidence qualifies as sufficient to withstand summary judgment. Prime cites *Filter Dynamics Intern., Inc. v. Astron Battery, Inc.*, 311 N.E.2d 386, 399 (Ill. App. Ct. 1974) to justify its position that the Court require "clear and convincing" circumstantial evidence. However,

*Filter Dynamics*'s "clear and convincing" standard has neither been cited nor disagreed with by *any* Court applying Illinois law over the past thirty years. Further, *Filter Dynamics* strangely borrowed its "clear and convincing" standard from a line of mostly irrelevant conspiracy cases. Therefore, this Court seriously doubts whether *Filter Dynamics* remains good law in Illinois, if indeed it *ever* was.

Instead of the "clear and convincing" standard suggested by Prime, Tempco asks that the Court apply the standard found in *PepsiCo, Inc. v. Redmond*, 1995 U.S. Dist. LEXIS 19437 at *37 (N.D. Ill. 1995). This standard permits plaintiffs to:

> . . . construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything."

*Id.*

Although to date no Illinois state court has applied *PepsiCo*, this standard was recently applied by the federal Central District of Illinois. *See Rotec Indus. v. Mitsubishi Corp.*, 179 F. Supp. 2d 885, 895-896 (C.D. Ill. 2002). However, the Court notes that *PepsiCo* concerned a motion for preliminary injunction, not a motion for summary judgment. As a result, the *PepsiCo* court considered circumstantial evidence in the context of a "likely to prevail"

standard, rather than the familiar summary judgment doctrine that no summary judgment can issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Here, in considering the sufficiency of Tempco's circumstantial evidence, Tempco does not have to meet a burden of being "likely to prevail," but need only show that a reasonable jury *could possibly allow* them to prevail. Therefore, although the Court finds *PepsiCo's* reasoning mostly persuasive, the Court believes it should slightly modify the standard to make it consistent with the principles of summary judgment. Specifically, the Court finds that, under the Illinois Trade Secrets Act, the nonmoving party may withstand summary judgment even if they present exclusively circumstantial evidence. However, the nonmoving party must present circumstantial evidence of a quantity and quality sufficient *to allow a reasonable jury* to draw legal inferences which would permit it to find for the nonmoving party by a preponderance of the evidence in consideration both also of any direct evidence submitted by the nonmoving party, and also all evidence (both direct and circumstantial) presented by the moving party.

Having elucidated a standard, the Court must now apply it. To demonstrate misappropriation of trade secrets, Tempco must show that its information was secret, misappropriated, and used in Prime's business. *AutoMed Technologies, Inc. v. Eller*, 160 F. Supp.2s 915, 920 (N.D. Ill. 2001). Obviously, a threshold issue to establishing

Prime's use of SA/2 is showing that Prime even *possessed* SA/2 after March 18, 2002. To support this point, Tempco notes that: 1) Prime failed to return between one and three hardware access keys; 2) SA/2 remained on Steve Shoemaker's laptop computer; 3) Prime President Larry Kendrick's request to new Prime employees Shoemaker and Chuck Hixson that they not return hardware access keys acquired while working at PE Products; 4) Prime's website claim that it has "developed a Manufacturer's OEM cross reference," one of SA/2's functions; and 5) Hudson's testimony that Kendrick told one of Prime's salespersons that he had found a way to access SA/2 databases using a commercially available software program called Crystal Reports.

Prime responds to Tempco's allegations that it retained SA/2 in its computers by noting that it paid a company called PC AfterDark to inspect twenty-five working computers and seven non-working computers at Prime and report whether any remnants of SA/2 existed on those computers. Further, Prime notes that although Tempco could have paid for its own inspection of Prime's computers during discovery, it elected not to do so.

The Court finds these facts persuasive. Although Tempco correctly notes that PC AfterDark conducted only a minimalist inspection of Prime's computers, costing a mere $50, it remains a fact that PC AfterDark's analysis constitutes hard and undisputed evidence. Tempco could have sought after and potentially found rebuttal evidence that Prime secretly kept SA/2 installed and made use of it. Numerous cases demonstrate the potential value of such

evidence.  For example, in *RKI, Inc. v. Grimes*, 200 F. Supp. 2d 916, 922-923 (N.D. Ill. 2002) such computer evidence proved vital in establishing the requisite amount of circumstantial evidence necessary to find a misappropriation of trade secrets.  Similarly, in *YCA v. Berry*, 2004 U.S. Dist. LEXIS 8129 (N.D. Ill 2004), a case recently before these Chambers, the plaintiff hired a computer expert to reconstruct deleted files and create a report detailing when each file was accessed.  This Court found the evidence discovered by this expert so compelling that not only did plaintiff withstand summary judgment on most claims, including some trade secrets claims, but plaintiff even succeeded in winning sanctions against the defendant for perjury based in large part on the recovered deleted files.  *Id* at *22.

Tempco has a valid point that a more thorough examination of Prime's computers than that conducted by PC AfterDark might have revealed the presence of SA/2-related files.  However, Tempco – as the plaintiff – has the burden of proof, and therefore the responsibility to conduct such a thorough inspection.  Tempco cannot simply sit back and complain about the inadequacy and/or bias of Prime's inspection efforts.  Put simply, the Prime-ordered inspection of Prime's computers, as done by PC AfterDark, met Prime's initial summary judgment burden of showing an absence of material fact by showing that SA/2 did not exist on Prime's computers.  To rebut, Tempco must produce some actual *evidence* that SA/2 or SA/2-related files remained in Prime's possession.  Instead, Tempco has produced

only speculation and conjecture. Each of Tempco's supposed circumstantial facts has an easily produced explanation by Prime. For example, while Tempco makes a big deal over Prime's failure to return between one and three hardware access keys, Prime claims that it simply lost or misplaced the keys. Likewise, although Tempco notes that Prime at first hesitated regarding whether or not to return Shoemaker's hardware access key to PE Products (suggesting perhaps, a momentary urge to misappropriate SA/2), the undisputed evidence indicates that the key *was* eventually returned. While these disagreements certainly create uncertain issues of fact, the sum total of these factual disputes do not amount to the genuine issue of *material* fact necessary to survive summary judgment – given Prime's hard and un-refuted computer evidence that SA/2 did not remain on its computers. Tempco claims to have constructed a "web of circumstantial facts," and a web certainly is the appropriate analogy – Tempco's rank speculation as to what might be on Prime's computers is as flimsy and easily broken as a spider web, and contains just as many gaping holes.

There is one caveat to the above analysis. Tempco has produced solid, direct evidence via Shoemaker's deposition testimony that SA/2 remained on Shoemaker's Prime-issued laptop computer. However, since this evidence derives entirely from Shoemaker's deposition testimony, the Court finds the rest of Shoemaker's testimony highly instructive. Notably, Shoemaker remarks that, because he lacked a hardware access key, "you could not use that Prime SA/2 program. Even if it was

installed you could not use it." Shoemaker's statements that he couldn't use his installed SA/2 program makes the confession that it remained installed of little practical value. In order for Tempco to adduce anything from Shoemaker's testimony, it would have to convince a jury that Shoemaker testifies forthrightly when he admits that SA/2 remained on his computer, but flat out lies when he denies using it despite having no apparent personal interest in doing so, as he no longer remains employed by Prime. This Court does not believe that any rational jury could reach such a conclusion. Furthermore, Tempco has once again failed to produce computer evidence from Shoemaker's computer which could, for example, indicate whether SA/2 remains on the computer now (even though Shoemaker has left Prime), or the last time it was accessed.

For the reasons stated above, the Court grants summary judgment as to Counts IV and V.

### D. Count VI: Breach of Distributor Agreement

With respect to Count VI, Prime seeks only partial summary judgment. Prime concedes that an issue of fact exists as to whether or not it violated the distributor agreement by selling products within the four-state region designated by the agreement. However, Prime argues that the distributor agreement's geographic provision § 1(A) limits the effects of the *entirety* of the agreement to those four-states. Accordingly, Prime contends that Tempco has no claim with § 1(A). Furthermore, Prime asks the Court to interpret the Court based on what it contends as is the agreement's unambiguous

language.  Prime argues that this supposedly unambiguous language, when combined with the agreement's integration clause in § XII(b), prevents any finder of fact from resorting to parole or extrinsic evidence to interpret the agreement.

Tempco responds by noting that the plain language of § IX(D) (*i.e.*, "Distributor shall be allowed to carry other lines in related fields, none to be competitive with Tempco. . . .") does not include any geographic provision.  This lack of a geographic provision, Tempco contends, at least creates an ambiguity in the contract as to whether or not § I(A) applies to the entirety of the agreement or only limits the territory of the distributorship.  Given this alleged ambiguity, Tempco asks the Court to turn to extrinsic evidence regarding the parties' contractual intent.  Tempco believes that this parole evidence, combined with the ambiguity, qualifies as enough to defeat Prime's motion for summary judgment.

After examining the contract, the Court believes that no ambiguity exists that would allow the Court to turn to extrinsic evidence, given § XII(B)'s integration clause.  Clause I(A) of the agreement clearly states under the heading of "Geographical," the "State *[sic]* of Georgia, Alabama, Tennessee, Mississippi."  § 1(A) does not state its purpose (*i.e.*, it does not state, as Tempco evidently wishes it did, that it limits the extent only of Prime's rights but not its obligations), nor does it place any limits on its applicability.  Therefore, the only logical reading of § 1(A) is that it applies to the entire agreement, unless otherwise stated or

exempted. Not a single provision in the agreement contains such an exemption. Similarly, not a single provision including the disputed § IX(D) repeats § 1(A)'s language regarding the geographic limitation. Consequently, it borders on the nonsensical for Tempco to argue that § 1(A) applies to the entire agreement *except* § IX(D). The Court, therefore, finds that § 1(A) unambiguously applies to the entire contract including Prime's obligations under § IX(D). Hence, Prime's motion for partial summary judgment on Count VI is granted.

### III. CONCLUSION

For the reasons stated herein, Prime's Motion for Partial Summary Judgment is **DENIED** as to Counts I, II, and III, and **GRANTED** as to Counts IV, V, and VI.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Date: _May 27, 2004_

- 26 -