Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3572 | **DATE** | 12/14/2004 |
| **CASE TITLE** | Tempco Electric Heater vs. Temperature Engineering Company | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: The court enters Judgment in favor of Tempco and against Prime as follows: Damages for lost profits in the amount of $560,497; liquidated damages for the three unreturned access keys in the amount of $45,000.00; and interest on the $45,000.00.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | DEC 15 2004 date docketed | |
| ✓ | Docketing to mail notices. | | | 122 |
| ✓ | Mail AO 450 form. | | GMA docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| WAP | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
DEC 1 4 2004
JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

TEMPCO ELECTRIC HEATER
CORPORATION, an Illinois
corporation,

    Plaintiff,

v.

TEMPERATURE ENGINEERING
COMPANY, a Georgia corporation,
d/b/a PRIME INDUSTRIES,

    Defendants

Case No. 02 C 3572

Hon. Harry D. Leinenweber

MEMORANDUM OPINION AND ORDER

DOCKETED
DEC 1 5 2004

I. INTRODUCTION

The plaintiff, Tempco Electric Heater Company (hereinafter, "Tempco"), brought this suit against Temperature Engineering Company, d/b/a Prime Industries (hereinafter, "Prime") alleging the breach of a Distributor Agreement, the breach of a License Software Agreement, for liquidated damages for failure to return three hardware access keys, for violation of Section 43(a) of the Lanham Act and a Trademark Licensing Agreement, and for violation of the Illinois Trade Secrets Act.

Tempco manufactures electric heaters and temperature sensors used largely as component parts on manufacturing equipment in the plastics industry. Prime is a distributor of such products mainly in the Southeastern United States. Prior to 1996 Prime purchased products from Tempco for resale in its distribution area. In 1996,

122

Tempco was seeking a distributor in the Southeast and Prime was interested in taking Tempco on as a client. As a result, the parties entered into a Distribution Agreement in which Prime agreed, among other things, to be Tempco's exclusive distributor in the states of Georgia, Alabama, Mississippi, and Tennessee. In return Prime was giving preferential pricing: a 54% discount off of list prices for most of Tempco's products, as opposed to the discount that resellers received which ranged from 25 to 45%. While the Distributor Agreement had many provisions, the one involved in this suit is Section IX(D) which states: "Distributor shall be allowed to carry other lines in related fields, not to be competitive with Tempco products, as illustrated in Tempco's Product Line Catalog."

Hand-in-hand with the Distributor Agreement came a License Software Agreement that permitted Prime, as an authorized Tempco distributor, to use Tempco's trade secret computer pricing software program known as SA/2. This agreement mandated that Prime use SA/2 "exclusively for purposes consistent with [its] relationship with Tempco." The agreement also provided that Prime would be allowed to use Tempco-supplied "hardware access keys" that allowed the SA/2 to work. The License agreement further stipulated that Prime must pay Tempco $15,000 plus interest in "liquidated damages" per key that it fails to return to Tempco at the conclusion of their relationship. Tempco claims that Prime continued to use SA/2 in violation of the

agreement after the relationship between the two companies ended. Tempco also claims that Prime failed to return three access keys.

Tempco further claims that Prime removed Tempco's name and identifying information from some Tempco products sold by Prime to its customers. This "reverse passing off" caused confusion in the marketplace and deprived Tempco of the name recognition necessary to obtain repeat business.

Prime takes the position that it did not violate any of its agreements with Tempco; failed to return only one of the access keys; did not violate any of Tempco's trade secrets; nor did it violate the Lanham Act. Specifically Prime contends that under the Distributor Agreement it was allowed to carry products of other manufacturers so long as Tempco products were not competitive either on price or delivery time. It further contends that Tempco has failed to produce sufficient evidence that it altered any product of Tempco or that there was any customer confusion. It further contends that Tempco failed to produce any evidence that it violated the Trade Secrets Act by utilizing SA/2 after termination of the Distributor Agreement. It further contends that Tempco failed to produce any evidence that it failed to return or that it continued to possess any of the SA/2 related materials other than the single access key that which it apparently lost. It claims that it returned two of the disputed keys in 1990 because they were not working.

## II. FINDINGS OF FACT

### A. The Distributor Agreement

1. While there were several disputed provisions of the Distributor Agreement, all but one were resolved by the Court in its ruling on Prime's Motion for Summary Judgment. The one remaining issue is the interpretation of Section IX(D). Tempco contends that the provision is straightforward: Prime is not allowed to sell any product of any other manufacturer in the four-state area if that product is carried in Tempco's catalog, and is thus competitive. Prime, on the other hand, contends that the section is ambiguous because it does not define "competitive." Prime interprets the provision to read that it may sell a competitor's product regardless of whether Tempco carries the same product if any one (or more) of three factors was present: (1) where Tempco could not meet a customer's price; (2) where Tempco could not meet a customer's delivery requirements; or (3) where a customer refused to accept a Tempco product. The Court agrees with Tempco's position and finds that the provision is not ambiguous and that Prime agreed not to sell any product that Tempco carries in its catalog, even if Tempco could or would not meet a customer's price, delivery needs, or desires. The word "competitive" in the context of the Distribution Agreement is an adjectival verb that modifies Tempco products which are found in the Tempco catalog. Prime accepted several benefits when it entered into the Distributor Agreement: it got an exclusive

territory and it got a much larger discount than what it received as a reseller. As Tempco pointed out, Prime had an obligation to use its best efforts to sell Tempco products. The 54% discount gave Prime a great deal of pricing flexibility. Tempco offered a program to speed up delivery for which it normally charged a fee but which it usually waived for Prime so that in most cases delivery dates would not have been a problem. The price to Prime in return for these contractual benefits was that it might occasionally lose a sale. The only exception was that Prime was allowed to dispose of the inventory it possessed at the time the agreement was signed but was not to buy any competitive product from Tempco's competitors after that date.

2. The Court finds by a preponderance of the evidence that Prime repeatedly violated Section IX(D). First, of course, Prime does not dispute the fact that it sold products of other manufacturers in the four-state area during the term of the Agreement, even though those products were carried in Tempco's catalog. Second, its records show that it did so repeatedly over the entire course of the agreement. Third, it entered into distribution agreements with some of Tempco's main competitors whereby it agreed to distribute their products in the four-state area during the lifetime of Prime's agreement with Tempco.

3. Prime failed to prove that Tempco waived compliance with Section IX(D). Although some of Prime's witnesses testified that Tempco's area sales representative, William Kilberry, acquiesced in

Prime's interpretation of the contract, Kilberry denied it and there was no credible reason why Tempco would agree to waive a provision for no apparent benefit to itself. To the extent that on occasion Kilberry did acquiesce in Prime's conduct such acquiescence did not arise to the level of proof of waiver.

### B. Breach of License Software Agreement

1. Tempco's original claim under the License Software Agreement was that Prime distributed or threatened to distribute SA/2 and that it failed to return SA/2 disks, CD-ROMS, manuals, and access keys upon termination of the agreement. However, there was no evidence that any of the materials other than three access keys were retained beyond the term of the Agreement. There was some evidence that Prime breached the Agreement by using the program to sell competitive products. This evidence came from the deposition testimony of Rick Hudson, a one time outside sales engineer at Prime. Other employees from Prime denied using SA/2 in this fashion. Although the evidence showed that it was not difficult to obtain pricing from any of Tempco's competitors, certainly Prime employees would use SA/2 to obtain the prices of Tempco products for purposes of initially trying to sell them. Prime most certainly used the pricing information so obtained in comparing Tempco's prices with those of a competitor. It was this information that Prime was able to use to decide whether to sell competitive products in violation of

the Distribution Agreement. The Court finds that Tempco has proved a violation of the License Software agreement.

### C. Failure to Return Three Access Keys

1. Tempco claims that Prime failed to return three hardware access keys out of the 20 that it had been given. Prime admits that it failed to return one key but claims that it returned two keys in 2000 for which it was not given credit. The evidence shows that David Cattapan, Tempco Systems Engineer Manager, who was responsible for the computer networks and software, made numerous requests to Prime starting in January 1991, to obtain an inventory of outstanding access keys. Prime did not respond to any of his requests. Cattapan kept a log file for the keys which did not disclose the return of the two keys. On the other hand Prime did not keep records of the location of the keys assigned to it. The Court therefore finds that Tempco has proved by a preponderance of the evidence that Prime failed to return the two disputed access keys, in addition to the one it admits it failed to return. This failure constituted a violation of the License Software Agreement and subjects Prime to its liquidated damages provision.

### D. Violation of the Lanham Act and the Trademark Agreement

1. The evidence provided by Tempco basically consisted of the testimony of Rick Hudson and David Farmery. The former is described by Prime as a "disgruntled former employee" of Prime and the latter is an employee of Star Electric, a competitor of Prime and Prime's

successor as Tempco's regional distributor. They testified that they observed Tempco products that bore the Prime name and part number, and products with both the Tempco name and Prime name on them. The only evidence that tied Prime to the alterations of the products was Hudson's testimony that Jimmy Casillo and Allen Weaver, Prime employees, told him on several occasions they had removed Tempco identifying information from some Tempco Products. However, both Prime employees denied having done so and denied telling Hudson that they had done so. Hudson did not personally observe any such activities. There was no physical evidence such as altered products produced to corroborate Hudson's testimony. There was evidence however that Tempco on several occasions private labeled products at Prime's request which could account for the products that Hudson and Farmery observed. The Court finds that Tempco has failed to prove by a preponderance of the evidence a violation of the Lanham Act or the Trademark agreement.

### E. The Trade Secrets Act

The claim of violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1, et. seq., is based on Tempco's claim that Prime continued to use the SA/2 program after termination of the License Software Agreement. Tempco presented no direct evidence that Prime utilized the SA/2 program after termination. Instead, it relies on circumstantial evidence, consisting of the failure to return three access keys, and the deposition testimony of Prime employee, Steven

Shoemaker, that SA/2 was not removed from his laptop computer. However, at trial, Jonathan Kendrick testified that he personally inspected Shoemaker's laptop and SA/2 was no longer on that machine. There was no evidence presented that any of the other computers continued to have SA/2 after the termination. In fact, Prime hired an outside source to examine its computers that concluded that the SA/2 program had been removed from its computers. Tempco did not seek to examine any of the Prime computers so it could provide no direct evidence that the program remained on any of Prime's computers. The Court, therefore, concludes that Tempco has failed to meet its burden of proof on its claim that Prime violated the Illinois Trade Secrets Act.

### F. Damages

1. Since the Court has found that Prime breached the Distributor Agreement and the License Software Agreement, Tempco is entitled to any damages that it was able to prove. Tempco relies on the testimony of Paul Wickland, its Chief Financial Officer since 1993. Wickland attempted to quantify Tempco's damages based on his belief that, had Prime not breached its agreement with Tempco, each sale of a competing product by Prime meant that Tempco lost a corresponding sale of that product. He deducted Tempco's marginal costs which would have been incurred had Tempco manufactured these products for these sales from the revenues Tempco allegedly lost due to Prime's sale of competing products from other manufacturers, to

determine Tempco's lost profits. The lost revenues were based on Tempco's list price of the products sold minus Prime's 54% discount. In addition to these damages, he also calculated lost profits from what he claimed would have been repeat business based on initial sales of these products. Wickland theorized that since Tempco products constitute component parts of machinery, such parts would wear out over time and require replacement. An end user would be more likely to replace a Tempco part with another Tempco part.

In order to compute these damages Wickland relied upon Prime's records that were available and produced in discovery. These consisted of purchase orders and invoices which included sales both within and outside the four-state area. Since this Court had previously ruled that Tempco was only entitled to damages from lost sales in the four-state area and since Prime sold in other areas, Wickland came up with a methodology for reducing Prime's total sales to those of the four-state area. His methodology consisted of splitting Prime's sales into two categories: drop shipments, i.e., where the product was shipped directly to the end user, and non-drop shipments, i.e., where the product was sent to the distributor (Prime) for redistribution. The former was easy to determine based on the addresses on the invoices. The latter had to be estimated, and Wickland concluded that 80% of non-drop shipments would be as a result of sales in the four-state area. His reasoning was based on the fact that Prime's business was located in the four-state area and

it had a greater knowledge of that territory, thus a large majority of its business would be in this area. He also relied on his knowledge and experience in the industry.

Since there was no way to determine the loss of repeat business from Prime's records, Wickland used Tempco's own records and experience as a proxy. Tempco does a large amount of direct business in the states of California and Pennsylvania. He reasoned that Tempco's experience there would be similar to Prime's in the four-state area. Wickland created a database of all sales to end user customers in those two states during a six-year period. The criteria used to establish a repeat business sale was the sale of a product where there was at least one repeat buy, i.e., the same part number purchased by the same customer but under a different purchase order. He found that in these two states 43.45% were single buys and 56.55% were repeat buys. He then applied this factor to the alleged lost sales in the four-state area to determine lost revenues from repeat business. He then deducted the marginal costs to arrive at an estimate of lost profits. His estimate of the total lost profits suffered by Tempco for lost sales and lost repeat business was $840,745.

Prime attacked Wickland's analysis on three general grounds: Wickland assumed without any basis in fact that each Prime purchase was a lost sale to Tempco; Wickland lacked the necessary foundation to offer a lay opinion; and his methodology was deeply flawed and

without basis in fact. However, his methodology was necessitated by the fact that Prime's records did not allow for a more accurate assessment and Prime does not suggest that they do or how. However, the Court agrees that his estimate of lost profits is excessive and must be substantially reduced because the Court finds that there would not be a loss of a sale for every sale of a competitive product. The evidence disclosed that on many products Tempco prices were higher than the prices of many of its competitors, although its products were of high quality. There was testimony that on occasion Prime's customers refused to accept Tempco products. There was some evidence that Tempco's regional manager of sales, Kilberry, may have on occasion acquiesced in some sales by Prime of competitive products due to price or delivery problems (but not enough to establish waiver). In any event, the Court believes that it is extraordinarily unlikely that each sale of a competitive product by Prime was a lost Tempco sale. Certainly the evidence was very consistent with the allegation that Prime, rather than cut its profits by cutting its price of the Tempco product, substituted a product whose manufacturer gave it a higher profit margin. However the Court finds that Wickland's estimate of lost profits should be reduced by one-third to $560,497.

2. Prime attacks Wickland's credentials as a damage witness. However, the evidence showed that he has been Tempco's Chief Financial Officer since 1993. Prior to that time, he was a financial

analyst and is a Certified Public Accountant. He thus, by education and experience, was well qualified to give his opinions in this case. As was noted in Micro Data Base Systems v. Dharma Systems, Inc., 148 F.3d 649, 657 (7th Cir. 1998) "There is no rule that damages can be proved only by documents, only by experts, or only by disinterested third parties."

3. Since the use of SA/2 by Prime assisted it in selling products of competitors by making it easier to make price and profit comparisons, the Court has held that such use violated the License Software Agreement. Thus, the violation of the License Software Agreement assisted Prime in violating the Distributor Agreement, but did not cause Tempco any further damages other than the lost sales and repeat business. Thus, the Court makes no independent assessment of damages based on violation of the License Software agreement.

4. The License Software Agreement provided for liquidated damages in the amount of $15,000 plus interest for the failure to return an access key. Based on the failure to return three keys, the Court finds that Tempco is entitled to liquidated damages of $45,000 plus accumulated interest.

### III. CONCLUSIONS OF LAW

1. Tempco's claim under the Distributor Agreement, involved the interpretation of the term "competitive product." Where a term is not defined in a contract, the Court should look to the common and generally accepted meaning of the word. Just because there is

disagreement about the meaning does not create an ambiguity. Dean Management, Inc. v. TBS Construction, Inc., 274 Ill. Dec. 161, 166-167 (Ill. App. 2 Dist. 2003). As the Court has found the word "competitive" is an adjectival verb modifying "product" which is defined in the agreement as one of the items illustrated in the Tempco catalog. The Court therefore finds as a matter of law that the term "competitive product" in the Distribution Agreement means any product of Tempco that is listed in the catalog without regard to pricing or delivery consideration.

2. In order to constitute waiver under Illinois law, the facts and circumstances must show an intentional relinquishment of a known right. Waiver can be express or implied but is generally a question of fact for the finder of fact. Will v. Will Products, Inc., 65 Ill. Dec. 430. 433 (Ill. App. 2 Dist. 1982). The Court has specifically found that the actions of Tempco did not rise to a level that would constitute a waiver of the exclusive sale provision.

3. The proper measure of damages in a breach of contract action under Illinois law is the amount that will place the injured party in as satisfactory position as it would have been had the contract been performed. Royals's Reconditioning Corp. v. Royal, 228 Ill. Dec. 365, 367-8 (Ill. App. 1 Dist. 1997). The non-breaching party to a contract may be entitled to profits it would have gained had the breaching party performed. Id. In this case Tempco is entitled to lost profits on any sales that the evidence showed

resulted from Prime's violation of the Distributor Agreement. Since loss of profits is prospective, it will by necessity to some extent be uncertain and incapable of calculation with mathematical precision. Recovery may be had when there are reasonable criteria by which the profits can be estimated with reasonable certainty and not on conjecture or sheer speculation and must be directly attributable to defendant's breach. Midland Hotel v. Reuben H. Donnelley, 113 Ill. Dec. 252, 257 (Ill. 1987). Here the Court has found that Tempco's damage claim is based on the best available evidence and upon reasonable criteria. There is no question that the damages if any exist were attributable to Prime's breach.

## IV. **CONCLUSION**

Accordingly the Court enters Judgment in favor of Tempco and against Prime as follows: Damages for lost profits in the amount of $560,497; liquidated damages for the three unreturned access keys in the amount of $45,000.00; and interest on the $45,000.00.

**IT IS SO ORDERED.**

Dated: December 14, 2004

Harry D. Leinenweber, Judge
United States District Court